[PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-15078

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 30, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-20181-CV-MGC


BURGER KING CORPORATION,

                                        Plaintiff-Counter
                                        Defendant-Appellee,


                    versus


E-Z EATING, 41 CORPORATION,
E-Z EATING 47 CORPORATION,
ELIZABETH SADIK,
LUAN SADIK,
E-Z EATING 8TH CORP.,
E-Z EATING 46TH CORP.,

                                        Defendants,
                                        Counter-Claimants,
                                        Appellants.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 30, 2009)

Before BARKETT and FAY, Circuit Judges, and TRAGER,[*] District Judge.

FAY, Circuit Judge:

This litigation involved the operation of several Burger King franchise restaurants in the New York area by Appellants Elizabeth and Luan Sadik and their corporate entities. The parties brought multiple claims and counterclaims against each other in three separate lawsuits. These cases were consolidated before Judge Cooke, who held numerous hearings before issuing two final summary judgments against Appellants.

The appeal pending here has been boiled down to one key question: whether Appellee Burger King Corporation ("BKC") violated an implied covenant of good faith and fair dealing in failing to grant Appellants an exception to a system-wide program known as the Value Menu. A subpart of this question is whether or not Appellants properly requested such an exception. After reviewing the record, studying the briefs, and hearing oral argument, we conclude that Appellants failed to create a genuine issue as to whether they properly requested an exception to the Value Menu. We therefore affirm the summary judgments against them.

## I.   FACTS

### A.   Background

_____

[*] Honorable David G. Trager, United States District Judge for the Eastern District of New York, sitting by designation.

2

## 1. *The Parties and Franchise Agreements*

BKC is a Florida corporation that operates a world-wide system of both company-owned and franchised fast-food restaurants. Through various corporate entities,[1] Appellants Elizabeth and Luan Sadik ("the Sadiks") owned and operated five of BKC's franchised restaurants in New York City, New York. Four of the Sadiks' franchise restaurants are the subject of this action.[2] All four restaurants were "in-line" restaurants - that is, they were not free-standing buildings. They were as follows:

| Number | Location | Date of Franchise Agreement |
|---|---|---|
| BK #12287 | 777 8th Avenue<br>New York, NY | March 10, 1999 |
| BK #12288 | 55 West 46th Street<br>New York, NY | August 4, 1999 |
| BK #11100 | 485 5th Avenue<br>New York, NY | October 15, 1997 |
| BK #13447 | 129 East 47th Street<br>New York, NY | February 2, 2001 |

---

[1] These corporate entities are: E-Z Eating 8th Corporation, E-Z Eating 41st Corporation, E-Z Eating 46th Corporation, and E-Z Eating 47th Corporation.

[2] As explained below, this case involves the following three cases which were consolidated on January 30, 2008: (1) Burger King Corp. v. E-Z Eating 8th Corp., E-Z Eating 46th Corp., Luan Sadik & Elizabeth Sadik, Case No. 07-20181; (2) Burger King Corp. v. E-Z Eating 41 Corp., EZ Eating 47 Corp., Luan Sadik & Elizabeth Sadik, Case No. 08-20155; and (3) E-Z Eating 41 Corp., E-Z Eating 47 Corp., Luan Sadik & Elizabeth Sadik v. Burger King Corp., Case No. 08-20203.

The Sadiks entered into four identical Franchise Agreements[3] with BKC, assigned the Agreements to corporate entities they had created for each of the restaurants, and personally guaranteed the corporate entities' obligations. Several provisions of the Franchise Agreements are of particular relevance here. According to Section 5(A), the franchisee agreed to adopt and adhere to the operating procedures outlined in BKC's Manual of Operating Data ("MOD Manual"). Further, Section 5(A) provided that the franchisee "agrees that changes in the standards, specifications and procedures may become necessary and desirable from time to time and agrees to accept and comply with such modifications, revisions and additions to the MOD Manual which BKC in the good faith exercise of its judgment believes to be desirable and reasonably necessary."

Pursuant to Section 6(I), BKC agreed to provide "[s]uch ongoing support as BKC deems reasonably necessary to continue to communicate and advise FRANCHISEE as to the Burger King System including the operation of the Franchised Restaurant."

Section 18(A)(9) provided that abandonment of a franchise restaurant (defined as cessation of operations) without BKC's consent would constitute a

_____

[3] We refer to the Franchise Agreements based on the number of the restaurant to which they pertained - for example, "the #12287 Franchise Agreement." We also refer to the restaurants themselves based on their numbers - for example, "BK #12287."

material act of default and good cause for BKC to terminate the Agreement. Section 18(B) granted the franchisees a limited license to use BKC's marks for as long as the Agreements remained valid.

## 2. *The Assistance Agreement*

After several years in business the Sadiks' restaurants became unprofitable, and the Sadiks fell behind in their payments to BKC. As of April 18, 2005 the Sadiks had defaulted on royalty payments, advertising fees, and other payments required under the Franchise Agreements. The Sadiks were indebted to BKC for $334,779.

The Sadiks began working with a BKC financial restructuring officer and came up with a plan to make their restaurants viable again. On June 16, 2005 the Sadiks signed a Guaranty in which they personally guaranteed to BKC each and every obligation the E-Z Eating corporate entities assumed in the Franchise Agreements. On June 21, 2005, Appellants entered into an Assistance Agreement in which they agreed to a payment schedule and also executed a Promissory Note setting forth the terms on which they would pay their debts.

The Assistance Agreement included a cross-default provision. Specifically, according to Section VII(B), the occurrence of an additional event of default under any of the Franchise Agreements subsequent to June 21, 2005 would constitute

"Event of Default" as defined by the Assistance Agreement. According to Section VIII, the occurrence of such an Event of Default would constitute a default under every Franchise Agreement, and would automatically terminate each one without further notice from BKC.

### 3. BKC's Value Menu

On February 13, 2006 BKC sent a systemwide memorandum describing its new "Value Menu" (the "Value Menu Memo"). The Memo explained that while BKC's general policy was to allow franchisees to set prices for the products they sold, BKC was instituting a special Value Menu with items to be sold at certain maximum price points established by BKC. The Memo stated that the Value Menu was "a required menu item and, as such, must be sold in all U.S. restaurants unless an exception is granted pursuant to this policy memo." Further, the Memo stated, failure to comply would be considered a default under the applicable franchise agreement.

Regarding the Value Menu "exceptions," the Memo explained that "[t]here are certain very limited exceptions to this Policy, which BKC may grant in its sole and absolute discretion." The Memo outlined three different exceptions: for restaurants with limited access, for in-line restaurants, and for restaurants located in a highly seasonal tourist destination. Each exception had its own specific

criteria. The criteria for the in-line exception were: "(1) the restaurant must be an in-line restaurant, and not a free-standing building; (2) the restaurant must not have a drive-thru; and (3) no FFHR[4] competitor in the trade area is offering a value menu in accordance with the competitive chain's standard national value proposition." The Memo instructed franchisees who wished to qualify under the in-line exception to "provide a written request to their DVP [Division Vice-President] for an 'in-line' exception."

After receiving the Memo the Sadiks did not institute the Value Menu in their four franchise restaurants. On March 17, 2006 BKC Assistant General Counsel Stephanie Doan sent a "Demand for Compliance" letter to the Sadiks. This Demand informed the Sadiks that if all four of their franchise restaurants did not begin complying with the Memo and offering the Value Menu items at the maximum price points within forty-eight hours, BKC would declare a default in all four Franchise Agreements. The Demand stated that if the Sadiks believed they met the requirements for an exception to the Value Menu policy, they must submit a "written request, along with documentation" to the Division Vice-President. The Demand further stated that the terms of the Letter itself "may be modified only by a written modification under [Ms. Doan's] signature or the signature of another

_____

[4] Although we could not find a definition for this acronym in the briefs or the record, we believe it refers to "fast food hamburger restaurant."

BKC attorney" and that the Sadiks "[could not] rely on oral communications, and any reliance on oral communications is unwarranted."

Oliver Griffin, an attorney for the Sadiks and their corporate entities, responded to the Demand for Compliance with a letter addressed to Ms. Doan. Mr. Griffin's letter, dated March 20, 2006, stated that although the Sadiks had changed the menus at their restaurants to comply with the Value Menu Memo, they believed that the restaurants "[fell] within the allowable exceptions to BKC's policy directives found in the [Value Menu Memo]." The letter continued:

> Nevertheless, I understand that BKC has required my clients to make a formal application for the exception, which BKC will then investigate the substance of before it issues an opinion - this does not make sense for a number of reasons, which I would like to discuss with you over the phone.
>
> Therefore, upon receipt of this letter, please call me in order to discuss this matter, as well as other matters relevant to the ongoing relationship between BKC and my clients.
>
> Finally, and as you probably are aware, BKC has called a meeting between it and my clients, which is tentatively scheduled to take place on April 1, 2006. I would like to know, among other things, what BKC's agenda for this meeting is, in order that we can properly prepare for it.

Mr. Griffin sent another letter to Ms. Doan dated April 12, 2006 stating that "my clients qualify for an exemption from the [Value Menu] program, yet for reasons that are unclear, BKC will not agree to the

8

exemption."

Ms. Doan responded to Mr. Griffin on April 17, 2006 with the following email:

> I am in receipt of your letter dated April 12, 2006. I have not had the opportunity to discuss the Value Menu exemption request with my clients. [BKC] has specific guidelines regarding the BURGER KING restaurants eligible for exemption. If the E-Z Eating Corporations submitted written requests and back up data for an exemption at a restaurant or restaurants as required, and they did not receive an exemption, then those restaurants do not meet the qualifications to be exempted from the BK Value Menu. The BK Value Menu is a required menu item unless an exemption is granted based on the defined criteria.

On April 19, 2006 Mr. Griffin wrote back: "[Ms. Doan], please discuss the value meal exemption with your client and get back to me, as that was a key point of my letter." On April 22, 2006 Ms. Doan replied: "I asked the [DVP], the local business person and the local marketing person and nothing was submitted to them. Can you tell me where they sent the exemption request?" No further letter or email exchanges on this topic appear in the record.

### 4. *The Closing of Two Restaurants: BK #12287 and BK #12288*

The #12287 Franchise Agreement provided that the 8th Avenue location was

to remain open for business until January 11, 2011.[5]  The #12288 Franchise

Agreement provided that the 46th Street location was to remain open for business

until August 3, 2019.  In January 2007 the Sadiks stopped operating BK #12287.

Two months later, they stopped operating BK #12288.

In a letter to the Sadiks dated January 17, 2008 Ms. Doan formally declared

the remaining two Franchise Agreements terminated.  Specifically, Ms. Doan

stated that in ceasing operations at BK #12287 and BK #12288 without BKC's

written consent, the Sadiks had breached the Franchise Agreements corresponding

to those establishments.  Ms. Doan stated that in defaulting on two of their

Franchise Agreements, the Sadiks had thus defaulted on the Assistance Agreement

itself pursuant to Section VII(B) of that document.  Ms. Doan invoked Section VIII

of the Assistance Agreement to declare the remaining Franchise Agreements

terminated - that is, the #11100 and #13447 Franchise Agreements.  The letter

informed the Sadiks that they were to cease operations at those two establishments

and also to cease using any of BKC's marks.

**B.    Procedure**

On January 23, 2007 BKC sued over the premature closure of BK #12287 -

---

[5]  We note that while BKC and the district court refer to January 11, 2011 as the end date of the #12287 Franchise Agreement, according to the Agreement itself January 15, 2011 is the end date.  Ultimately, however, this discrepancy does not affect our decision.

specifically, BKC sued E-Z Eating 8th for breach of the #12287 Franchise Agreement, and sued the Sadiks for breach of their Guaranty of that Agreement. That case came before Judge Cooke of the U.S. District Court for the Southern District of Florida (the "Cooke Action"). On April 25, 2007 BKC filed its Amended Complaint adding E-Z Eating 46th as a defendant. The Amended Complaint sued E-Z 46th for breach of the #12288 Franchise Agreement, and the Sadiks for breach of their Guaranty of that Agreement. Appellants E-Z 8th, E-Z 46th, and the Sadiks counterclaimed against BKC for common law fraud, breach of contract (specifically, for breaching Section 6(I) of the Franchise Agreements in imposing the Value Menu), breach of implied duty of good faith and fair dealing (in imposing the Value Menu), and promissory estoppel.[6]

On November 30, 2007 BKC moved for summary judgment on its Amended Complaint and on Appellants' Counterclaims. After BKC's Motion for Summary Judgment was briefed, but before the district court's decision, BKC terminated the #11100 and #13447 Franchise Agreements based on a cross-default provision in Section VII(B) of the Assistance Agreement. On January 22, 2008 BKC filed a lawsuit against the Sadiks, E-Z Eating 41st, and E-Z Eating 47th before Judge Jordan (the "Jordan Action") for claims of trademark infringement and unfair

---

[6] Appellants later voluntarily dismissed the counts for common law fraud and promissory estoppel without prejudice.

11

competition, breach of the #11100 and #13447 Franchise Agreements, breach of the Assistance Agreement, breach of the Promissory Note, breach of the #11100 and #13447 Guaranties, and breach of the 2005 Guaranty, all based on the fact that BK #11100 and BK #13447 were still open for business even though BKC had terminated the corresponding Franchise Agreements. BKC also filed a motion for a preliminary injunction, requesting that Appellants cease operating BK #11100 and BK #13447 under the BKC name.[7] Appellants also filed a counterclaim in the Jordan Action asserting claims for declaratory judgment, breach of contract, and breach of implied duty of good faith and fair dealing.

On January 24, 2008 the Sadiks, E-Z Eating 41st, and E-Z Eating 47th filed a lawsuit against BKC before Judge Ungaro (the "Ungaro Action"). They raised claims for declaratory judgment, breach of contract (specifically, Section 6(I) of the Franchise Agreements), and breach of the implied duty of good faith and fair dealing.[8] They also sought injunctive relief in the Ungaro Action to prevent BKC from terminating the #11100 and #13447 Franchise Agreements and forcing them to close BK #11100 and BK #13447.

---

[7] The court granted the Motion for Preliminary Injunction on February 11, 2008, thus requiring Appellants to close BK #11100 and BK #13447.

[8] "Under Florida law, every contract contains an implied covenant of good faith and fair dealing, requiring that the parties follow standards of good faith and fair dealing designed to protect the parties' reasonable contractual expectations." Centurion Air Cargo, Inc. v. United Parcel Serv. Co., 420 F.3d 1146, 1151 (11th Cir. 2005).

12

On January 30, 2008 Judge Cooke consolidated the Cooke Action, the Jordan Action, and the Ungaro Action - all three cases now fell under Case Number 07-20181, with Judge Cooke presiding.

On May 22, 2008 the district court granted BKC's first Motion for Summary Judgment as to liability only. The court held that E-Z 8th, E-Z 46th, and the Sadiks defaulted on the #12287 and #12288 Franchise Agreements in ceasing operations at BK #12287 and BK #12288 prior to the expiration of the Agreements without BKC's consent. In so holding, the court rejected Appellants' affirmative defenses of waiver/estoppel, laches, unclean hands, standing, impossibility of performance, and failure to attach a writing. Further, the court granted summary judgment in BKC's favor on Appellants' Counterclaims for breach of contract and breach of the implied duty of good faith and fair dealing.

BKC filed another motion for summary judgment on June 6, 2008, this time against all Appellants in the now-consolidated case. Specifically, BKC's motion sought summary judgment on these remaining claims: all claims originally raised in the Jordan Action, all claims originally raised in the Ungaro Action, and BKC's requested damages in the original Cooke Action. In an order dated July 25, 2008 the district court granted summary judgment in BKC's favor on the claims in the Jordan and Ungaro Actions. The court also granted BKC permanent injunctive

13

relief prohibiting Appellants' unauthorized use of BKC's marks in connection with BK #11100 and BK #13447. Regarding damages, the district court held that Appellants owed BKC a total of $770,547.55 for past due royalties, outstanding payments on the Promissory Note, and lost profits in connection with BK #12287 and BK #12288.

## II. DISCUSSION

### A. Standard of Review

"We review the trial court's grant or denial of a motion for summary judgment *de novo*, viewing the record and drawing all reasonable inferences in the light most favorable to the non-moving party." Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes

demonstrate the absence of a genuine issue of material fact." Id. at 323 (internal

quotations omitted). If the movant succeeds in demonstrating the absence of a

material issue of fact, the burden shifts to the non-movant to show the existence of

a genuine issue of fact. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th

Cir. 1993).[9]

## B.    Analysis

In this appeal, Appellants only raise two challenges to the district court's

rulings. First, they challenge the court's grant of BKC's motions for summary

judgment, arguing a genuine issue exists as to whether BKC "frustrated the

essential purpose of the franchise agreements . . . by arbitrarily and unreasonably

refusing to grant the Appellants an available [Value Menu] exception." Initial Br.

at 2. Second, Appellants challenge the court's grant of summary judgment in

BKC's favor on their breach of implied covenant of good faith and fair dealing

claim.[10] Appellants seek reversal and remand "with instructions to proceed to trial

---

[9] We apply Florida law. "In a diversity case, a federal court applies the substantive law of the forum state, unless federal constitutional or statutory law is contrary." Ins. Co. of N. Am. v. Lexow, 937 F.2d 569, 571 (11th Cir. 1991). The forum state here is Florida. The parties agreed in Section 21(C)(1) of all four Franchise Agreements that Florida law would govern. "[U]nder Florida law, courts will enforce choice-of-law provisions unless the law of the chosen forum contravenes strong public policy." Maxcess, Inc. v. Lucent Techs, Inc., 433 F.3d 1337, 1341 (11th Cir. 2005) (internal quotations and citations omitted).

[10] "A breach of the implied covenant of good faith and fair dealing is not an independent cause of action, but attaches to the performance of a specific contractual obligation." Centurion Air Cargo, 420 F.3d at 1151. Indeed, "[t]his court has held that a claim for a breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law in the

on the E-Z Defendants claim for breach of the implied covenant of good faith and fair dealing." Id. at 34-35. Notably, Appellants do not challenge any of the district court's rulings on damages. We address both prongs of Appellants' appeal below.

### 1. BKC's Imposition of the Value Menu

Appellants argue that there is genuine issue of material fact as to whether they had a defense to BKC's breach of contract claims - specifically, as to whether BKC frustrated the essential purpose of the Franchise Agreements in imposing the Value Menu.

The district court held that BKC was entitled to impose its Value Menu on Appellants by the terms of the Franchise Agreements. The court stated that Section 6(I) gave BKC "discretion to decide whether to provide services and [Appellants] have not pointed to a general failure on behalf of BKC . . . which prevented them from operating their franchises." May 22, 2008 O. at 12. The court also noted that Section 5(A) of the Franchise Agreements "specifically require[s] [Appellants] to adhere to BKC's comprehensive restaurant format and operating system." Id. at 12-13.

We agree with the district court on this point. Section 5(A) of the Franchise Agreements provided that the franchisee "agrees that changes in the standards,

absence of a breach of an express term of a contract." Id. at 1152.

16

specifications and procedures may become necessary and desirable from time to time and agrees to accept and comply with such modifications, revisions and additions to the MOD Manual which BKC in the good faith exercise of its judgment believes to be desirable and reasonably necessary." There is simply no question that BKC had the power and authority under the Franchise Agreements to impose the Value Menu on its franchisees.

### 2. The Value Menu Exception

Appellants also argue that there is a genuine issue of material fact as to whether BKC breached Florida's implied covenant of good faith and fair dealing by denying them an exception to the Value Menu. However, we must answer two preliminary questions before we can address that issue. First, we must determine if Appellants may raise this issue on appeal. Second, we must determine if a genuine issue exists as to whether Appellants properly *applied* for an exception to the Value Menu - if so, we can determine whether there exists a genuine issue as to whether BKC should have granted such an exception.

### a. Can Appellants raise this issue on appeal?

Appellants argue that a genuine issue exists as to whether BKC breached Florida's implied covenant of good faith and fair dealing by denying them a Value Menu exception. As noted above, under Florida law this cause of action requires a

17

corresponding breach of an express contract term.  See Centurion Air Cargo, 420 F.3d at 1151-52.  Here, Appellants claim that in imposing the Value Menu and refusing to grant an exception, BKC breached Section 5(A) of the Franchise Agreements.  BKC responds that Appellants cannot raise this argument on appeal because they did not raise it to the district court[11] - that is, Appellants only argued breach of Section 6(I), not Section 5(A).  Whether the issue was raised under a specific paragraph of the contracts simply makes no difference - it clearly was raised and resolved.  Consequently, we find no merit in this argument.

> b.    *Is there a genuine issue of material fact as to whether Appellants properly applied for an exception?*

BKC argues that even if Appellants are allowed to raise the issue of a Value Menu exception, the district court judgment stands.  This is because, BKC argues, Appellants conceded that they did not apply for such an exception in writing to the Division Vice-President Jim Joy, as the Value Menu memorandum and Demand for Compliance explicitly required.  Appellants respond that they did create a genuine issue as to whether they properly applied in writing for a Value Menu exception.  They also argue that in any case, BKC waived the "in writing" requirement by meeting with Mr. Sadik in person.

---

[11] "Arguments raised for the first time on appeal are not properly before this Court." Hurley v. Moore, 233 F.3d 1295, 1297 (11th Cir. 2000).

18

We find that Appellants failed to establish a genuine issue as to whether they submitted a written request for a Value Menu exception. Mr. Sadik admitted in his deposition that he did *not* submit a written exception request, even though he was aware that the Value Menu Memo required exceptions to be requested in writing. See D.E. #128. Specifically, Mr. Sadik testified that at first he did not submit a written request because he "assumed all New York was out. It says in-line stores. My stores are in-line." Mr. Sadik further testified that he only applied for the exception "verbally" because he "assumed verbally was fine." When asked whether "anybody ever told [him] not to submit the written request," Mr. Sadik stated "no."

Although Appellants point to Mr. Griffin's two letters as support that they did submit a written exception request, neither letter creates a genuine issue for several reasons. First, the letters were addressed to Ms. Doan and not to Division Vice-President Jim Joy, as the Value Menu Memo and Demand for Compliance required. Second, neither letter actually asked for a specific exception, such as the "in-line" exception - indeed, neither letter specified *which* of the three exceptions the Sadiks sought, or why they qualified under a particular exception. Mr. Griffin's March 20 letter spoke generally of "the allowable exceptions," stating only: "it is our position that the EZ restaurants fall within the allowable exceptions

19

to BKC's policy directives found in the [Value Menu Memo]."  Moreover, Mr. Griffin's March 20 letter appears to expressly *not* comply with the formal application requirement: "I understand that BKC has required my clients to make a formal application for the exception, which BKC will then investigate the substance of before it issues an opinion - this does not make sense for a number of reasons, which I would like to discuss with you over the phone."  In his April 12 letter Mr. Griffin still did not mention which exception his clients sought, or why. In fact, in that letter Mr. Griffin seemed to assume the Sadiks had already applied for an exception: "my clients qualify for an exemption from the [Value Menu] program, yet for reasons that are unclear, BKC will not agree to the exemption." Third, these letters did not include back-up documentation, as the Demand for Compliance explicitly required.

As for Appellants' argument that BKC waived its requirement for a written exception request, we do not accept it.  Under Florida law, "waiver" is defined as "the voluntary and intentional relinquishment of a known right or conduct which implies the voluntary and intentional relinquishment of a known right."  Raymond James Fin. Servs., Inc. v. Saldukas, 896 So. 2d 707, 711 (Fla. 2005).  Further, according to Florida law, "[c]onduct may constitute waiver of a contract term, but such an implied waiver must be demonstrated by clear evidence."  BMC Indus.,

20

Inc. v. Barth Indus., Inc., 160 F.3d 1322, 1333 (11th Cir. 1998); see also, e.g.,

Kirschner v. Baldwin, 988 So. 2d 1138, 1142 (Fla. 5th DCA 2008) ("When a

waiver is implied, the acts, conduct or circumstances relied upon to show waiver

must make out a clear case."); Hale v. Dep't of Revenue, 973 So. 2d 518, 522 (Fla.

1st DCA 2007) ("If a party relies upon the other party's conduct to imply a waiver,

the conduct relied upon to do so must make out a clear case of waiver.") (internal

quotations and citation omitted).

Here, there is scant evidence regarding a meeting between Mr. Sadik and

BKC representatives at which they discussed Appellants' eligibility for a Value

Menu exception - too scant to create a genuine issue.  Appellants have not alleged

when exactly the meeting was, where it was held, who specifically attended, what

the attendees said, or what sort of information was exchanged. Indeed, although

Mr. Sadik referred to such a meeting in an affidavit, he said only this: "I met with

the FBL and other BKC representatives and explained to them that the Value Menu

was going to drive me into insolvency . . . ."  D.E. #115-2.  Further, he stated:

"[t]hese BKC representatives told me that they were going to report back to BKC

corporate and then give me an answer as to whether or not I would be excepted

from the Value Menu (as in line stores qualify, and my stores were in line stores)."

21

Id.[12]

In contrast to Appellants' vague evidence of a meeting in which BKC waived its written request requirement, *every* communication in evidence from BKC to the Sadiks on this topic invoked that requirement.[13] Indeed, as is apparent from Ms. Doan's email exchange with Mr. Griffin, as late as April 22, 2006 BKC representatives still assumed any Value Menu exception would be requested in writing. On that date, Ms. Doan wrote to Mr. Griffin: "I asked the [DVP], the local business person and the local marketing person and nothing was submitted to them. Can you tell me where [the Sadiks] sent the exemption request?" Mr. Sadik also admitted in his deposition that no one ever told him *not* to submit a written request. We find there is simply not enough evidence to create a genuine issue as to whether BKC waived its requirement that the Sadiks request a Value Menu exception in writing.

Because Appellants failed to create a genuine issue as to whether they

---

[12] Mr. Griffin also submitted an affidavit mentioning that Mr. Sadik met with BKC representatives and that Mr. Griffin provided BKC representatives with the Sadiks' "financials" and documentation. However, this affidavit is far too vague to create a genuine issue as to whether BKC waived its written exception requirement. As an aside, we are surprised at Appellants' reliance on Mr. Griffin's affidavit since this could disqualify him as their attorney at trial. See Fla. Stat. Bar Rule 4-3.7 ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness on behalf of the client" except in certain limited circumstances).

[13] This evidence includes the Value Menu Memo itself, the Demand for Compliance letter, and Ms. Doan's April 17, 2006 and April 22, 2006 emails. See supra p. 6-9.

properly asked for a Value Menu exception, we need not address whether BKC should have granted Appellants such an exception.

### III.   CONCLUSION

In sum, we find that BKC was clearly entitled to impose its Value Menu on Appellants, and Appellants failed to establish a genuine issue of material fact as to whether they properly applied for an exception from the Value Menu. Accordingly, the judgment of the district court is

AFFIRMED.