[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 13-10341, 13-10342, 13-10464
_____

D.C. Docket No. 0:07-cv-61693-JAL

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff - Appellee,

versus

JOSEPH J. MONTEROSSO,
LUIS VARGAS,
LAWRENCE E. LYNCH,

Defendants - Appellants,

GLOBETEL COMMUNICATIONS CORP., et al.,

Consolidated Defendants.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 30, 2014)

Before PRYOR, JORDAN, and FAY, Circuit Judges.

PER CURIAM:

This court issued an unpublished opinion in this case on March 3, 2014. Appellee, the Securities and Exchange Commission, subsequently moved to publish the opinion. Appellee's motion is GRANTED. We vacate our prior, unpublished opinion and substitute the following opinion for publication.

Joseph J. Monterosso, Luis Vargas, and Lawrence E. Lynch appeal summary judgment for the Securities and Exchange Commission ("SEC") and the remedies and penalties imposed for their participation in a fraudulent revenue scheme. We affirm.

## I. BACKGROUND

A. Formation and Operation of GlobeTel Communications Corp.

This case involves the SEC's investigation into a fraudulent scheme to generate fictitious revenue for a Florida-based, publicly traded, telecommunications ("telecom") company formerly known as GlobeTel Communications Corp. ("GlobeTel"). Timothy Huff was GlobeTel's chief executive officer ("CEO"), Thomas Jimenez served as GlobeTel's chief financial officer ("CFO") until March 2006, and Lynch was GlobeTel's chief operating

2

officer ("COO") from August 2004 until March 2006 and CFO from March to October 2006.  Monterosso managed GlobeTel's wholesale telecom business from June 2004 to September 2006, served as president until July 2006 for one of GlobeTel's subsidiaries, Centerline Communications ("Centerline"), and served as GlobeTel's COO from July 2006 to May 2007.  Monterosso directly reported to GlobeTel's CEO.

Vargas was the vice president of Centerline and the owner of another telecom company, Carrier Services, Inc. ("CSI").  Vargas assisted Monterosso in running GlobeTel's wholesale telecom business; he was also responsible for CSI's accounting and for preparing and forwarding CSI's and Centerline's sales documentation to GlobeTel.

In June 2004, Huff and Monterosso negotiated a joint venture agreement between GlobeTel and CSI, in which CSI would generate $25 million in revenue for Centerline in exchange for 5 million shares of GlobeTel stock.  Pursuant to the agreement, neither CSI nor Monterosso would receive payment unless Centerline generated $25 million in revenue.  Monterosso thereafter ran GlobeTel's wholesale telecom business and negotiated agreements on behalf of GlobeTel and its subsidiaries, Centerline, Volta Communications ("Volta"), and Lonestar Communications ("Lonestar").

3

B. The Fictitious "Off-Net" Revenue Scheme

1. Origin and Operation

Between 2004 and 2006, GlobeTel filed periodic reports describing its wholesale telecom business as buying and selling "large blocks of calling minutes with particular origination and termination points." R5–475 at 3.[1] As a wholesale telecom company, GlobeTel would generate revenue by connecting individual callers with the locations they wished to call, and the calls were routed through GlobeTel's "switch."[2] R3–313 at 3. Telecom companies pay by the minute for the right to route calls through the switches to other companies' networks. The switches then create call detail records ("CDRs") that register information regarding the traffic routed through them. GlobeTel's revenue depended upon the call traffic routed through the switch, as measured by the CDRs.

In 2004, in an effort to enhance GlobeTel's reported revenue, the "off-net" program was implemented. The term "off-net" referred to telecom traffic run on a switch neither owned nor operated by GlobeTel, Volta, Lonestar, or Centerline. R5–475 at 5. In essence, the "off-net" program was a scheme that involved creating false invoices to reflect alleged transactions between GlobeTel's

---

[1] These periodic reports were filed with the SEC, as required pursuant to the Securities Exchange Act of 1934.
[2] A "switch" is a device that routes calls and creates a temporary circuit or communication path to connect a caller to the recipient of that call.

4

subsidiaries and other companies.  Each quarter, a GlobeTel executive would tell

Monterosso an amount of revenue needed for that quarter.  To meet the requested

revenue, Monterosso and Vargas would receive invoices and CDRs from other

companies and would change the name to reflect sales to and from GlobeTel's

subsidiaries.  Starting in 2004, Ronald Hay, the owner of Mercury Telecom

("Mercury") and World Communications Carrier Services ("WCCS"), began

providing Monterosso and Vargas with WCCS invoices and CDRs.  These WCCS

invoices and CDRs were provided to Monterosso as part of a legitimate business

arrangement Hay had with Monterosso.  Upon receipt of the invoices, Vargas

would change the names on the invoices to show sales from Volta to Mercury and

purchases from WCCS to Volta.  Despite what the invoices showed, Volta never

sold anything to, or bought anything from, WCCS or Mercury.[3]

On December 27, 2004, Monterosso sent an email to John Petuoglu, one of

Hay's employees, requesting "additional revenue" before the end of the year.  In

this email, Monterosso listed the December invoices he already had received and

requested a specific amount be added to each one.  After this request, Hay did not

provide Monterosso and Vargas with any additional invoices.  Monterosso and

Vargas subsequently submitted the WCCS-to-Volta and the Volta-to-Mercury

---

[3] Apparently, Volta was never operational and did not have its own customers.

5

invoices to GlobeTel's accounting department. The invoices matched the real invoices but the customer name had been changed to Volta, and the amounts had been increased.

After Hay stopped providing invoices, Monterosso and Vargas started receiving CDRs from Chuck Leblo, and would use the data from these CDRs to create invoices on WCCS letterhead. Leblo had no connection to Hay's companies, and there was no authorization from Mercury or WCCS to create these invoices. Vargas used Leblo's CDRs to create invoices showing sales of minutes from WCCS to Volta and sales of minutes by Volta to Mercury. Vargas would then submit the invoices and CDRs to GlobeTel.

Leblo's CDRs and invoices also were used to manufacture revenue for Lonestar. In 2004 and early 2005, Monterosso and Vargas obtained CDRs and invoices purporting to show Lonestar had purchased minutes from Leblo's company XSTEL and had sold minutes to Leblo's company Telmetriks. Even after Leblo stopped providing invoices in 2005 and sent only CDRs, Vargas prepared XSTEL-to-Lonestar and Lonestar-to-Telmetriks invoices using Leblo's CDRs. Lonestar actually never transacted with XSTEL or Telmetriks.

GlobeTel also reported "off-net" revenue for Centerline from Vargas's company, CSI. Centerline, however, never bought from nor sold anything to CSI

6

as part of the "off-net" program.  From September 2004 to March 2006, Monterosso and Vargas created and submitted invoices showing Centerline and CSI were purchasing minutes from, and selling minutes to, each other.[4]

2. Continuation of the Scheme and GlobeTel's Knowledge

At Monterosso's direction, Vargas submitted the phony manufactured invoices reflecting the "off-net" business of Volta, Lonestar, and Centerline, to GlobeTel's accounting department.  GlobeTel recorded revenue, costs of goods, and expenses from Centerline and its subsidiaries by making entries in its general ledger.  Lynch, as GlobeTel's COO from August 2004 to March 2006 and CFO from March 2006 to October 2006, and Jimenez, as GlobeTel's CFO until March 2006, were responsible for recording the "off-net" revenue.  Lynch told Jimenez he always had believed the "off-net" revenue was "fake."  R5–475 at 13. Additionally, on January 12, 2005, Vargas accidentally sent Lynch an invoice from WCCS to another unrelated telecom company, and the following day, Lynch requested a "new one."  R5–475 at 12.

In April 2005, Lynch asked Monterosso to provide an extra $1.6 million in revenue for the first quarter of the year.  Monterosso then contacted Leblo to ask whether he had "any additional revenue . . . that GlobeTel could utilize."  R5–475

---

[4] Monterosso and Vargas initially obtained those invoices from Leblo, but once Leblo stopped providing invoices, Vargas used Leblo's CDRs to generate the CSI-Centerline invoices.

7

at 12.  Vargas also emailed Leblo the precise amount of revenue needed for each GlobeTel subsidiary over particular time periods within the quarter.  After sending the email requesting the particular amount, on May 2, 2005, Vargas sent Leblo another email stating the additional $1.6 million was "need[ed] . . . within the next couple of days."  R–314–28 at 79 (Ex. 161).  That same day, GlobeTel recorded the approximate $1.6 million in revenue in its general ledger.

In 2004 and 2005, the fraudulent "off-net" revenue accounted for approximately 58% and 87.4% of GlobeTel's revenue, respectively; and for the first quarter of 2006, it accounted for approximately 92%.  Because of the fictitious "off-net" revenue, from October 2004 through June 2006, GlobeTel's financial statements misstated the company's revenue by more than $100 million.  These misstatements were consequently made a part of GlobeTel's periodic reports, securities registration statements, and press releases.

C. SEC Investigations and Proceedings Below

In November 2007, the SEC filed a complaint against Monterosso and Vargas and alleged multiple violations of the Securities Act of 1933 ("Securities Act")[5] and the Securities Exchange Act of 1934 ("Exchange Act").[6]  In a separate action, in May 2008, the SEC filed a complaint against GlobeTel, Lynch, Huff, and

---

[5] 15 U.S.C. §§ 77a–77aa.
[6] 15 U.S.C. §§ 78a–78mm.

Jimenez. Lynch settled with the SEC on liability, but the civil penalties determination was left for a later date. Huff consented to judgment on both liability and remedies. The cases were consolidated in November 2008. In June 2009, the SEC filed the operative second amended combined complaint incorporating its allegations against all defendants.[7] As to Monterosso and Vargas, the SEC alleged: (1) violations of section 17(a) of the Securities Act;[8] (2) violations of section 10(b) of the Exchange Act[9] and Rule 10b–5;[10] (3) aiding or abetting violations of section 10(b) and Rule 10b–5; (4) aiding or abetting violations of section 13(a) of the Exchange Act[11] and Rules 12b–20, 13a–1, and 13a–13;[12] (5) aiding and abetting violations of section 13(b)(2)(A) of the Exchange Act;[13] and (6) violations of Rules 13b2–1 and 13b2–2.[14]

During their depositions, Vargas and Lynch invoked their Fifth Amendment privilege against self-incrimination and refused to answer substantive questions. The SEC requested an adverse inference be drawn against them. While the district judge conditionally granted the request, she declined to draw inferences as to each

---

[7] Upon consent, the district judge entered judgment against Jimenez and GlobeTel.
[8] 15 U.S.C. § 77q(a).
[9] 15 U.S.C. § 78j(b).
[10] 17 C.F.R. § 240.10b–5.
[11] 15 U.S.C. § 78m(a).
[12] 17 C.F.R. §§ 240.12b–20, 240.13a–1, 240.13a–13.
[13] 15 U.S.C. § 78m(b)(2)(A).
[14] 17 C.F.R. §§ 240.13b2–1, 240.13b2–2.

of the unanswered questions and noted she would "address each inference sought as it comes up." R5–464 at 18.

In March 2011, the district judge granted summary judgment in favor of the SEC against Monterosso and Vargas and found (1) they were liable for violating the antifraud provisions of the Securities Act and the Exchange Act;[15] (2) alternatively, they were secondarily liable for aiding and abetting GlobeTel's violations of the antifraud provisions; (3) they were liable for aiding and abetting GlobeTel's violations of section 13(a) and 13(b)(2)(A) and Rules 12b–20, 13a–1, and 13a–13; and (4) they were liable for violating Rules 13b2–1 and 13b2–2.

The district judge thereafter entered an order adopting the magistrate judge's report and recommendation to impose officer-and-director bars, order disgorgement plus prejudgment interest, and assess civil penalties ("remedies order"). The district judge held Monterosso and Vargas jointly and severally liable for disgorgement of $675,000, plus prejudgment interest, and assessed civil penalties of $300,000 against Monterosso, and $150,000 against Vargas. Lynch, having settled with the SEC on liability, was ordered to pay $780,000 in civil penalties. The judge rejected Lynch's arguments regarding his minimal involvement in the fraudulent scheme and disproportionate treatment and found his

---

[15] Section 17(a)(1), section 10(b), and Rule 10b–5(a).

10

"claim that his involvement in the subject fraud was minimal and unknowing is contradicted not only by the record but by his own consent to entry of judgment." R6–554 at 16.  The judge determined the magistrate judge's recommended amounts were warranted in light of the "egregiousness" of the violations and the parties' respective abilities to pay.  R6–554 at 13–15, 16–17.  The judge also enjoined Monterosso and Vargas from future violations of securities laws and imposed officer-and-director bars against them.

## II. DISCUSSION

Although appellants raise a number of issues, our principal concern is Monterosso and Vargas's appeal of the district judge's granting of summary judgment and Monterosso, Vargas, and Lynch's appeal of the remedies order.[16]

### A. Antifraud Violations

Monterosso and Vargas challenge the summary judgment on the SEC's antifraud claims.  They contend there was no evidence they were liable for the antifraud violations, and there was a genuine issue of material fact as to whether they acted with scienter.  We review a district judge's order granting summary judgment de novo and apply the same legal standards.  *Capone v. Aetna Life Ins.*

---

[16] We find the other arguments raised on appeal are meritless and do not warrant further discussion, because (1) the second amended combined complaint was pled with sufficient particularity as to each defendant; and (2) the district judge acted within her discretion in striking the portion of Monterosso's answer that contradicted his previous admissions, *see Krinsk v. SunTrust Banks, Inc.*, 654 F.3d 1194, 1202 (11th Cir. 2011).

*Co.*, 592 F.3d 1189, 1194 (11th Cir. 2010).  In conducting our analysis, we construe the facts and draw all reasonable inferences in the light most favorable to the non-moving party.  *Burger King Corp. v. E-Z Eating, 41 Corp.*, 572 F.3d 1306, 1312–13 (11th Cir. 2009).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Speculation or conjecture cannot create a genuine issue of material fact, and a "mere scintilla of evidence" in support of the nonmoving party cannot overcome a motion for summary judgment. *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004).

Section 10(b) of the Exchange Act provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.  Rule 10b–5, which implements section 10(b), provides it is unlawful "[t]o employ any device, scheme, or artifice to defraud."  17 C.F.R. § 240.10b–5(a).  It also is unlawful "[t]o make any untrue statement of a material fact" or to omit "a material fact necessary in order to make the statements made, in

12

the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

In order to establish a section 10(b) or Rule 10b–5 violation, the SEC must prove (1) a material misrepresentation or materially misleading omission; (2) in connection with the purchase or sale of securities; (3) made with scienter. *SEC v. Merch. Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007) (citing *Aaron v. SEC*, 446 U.S. 680, 695 (1980)). Section 17(a) of the Securities Act,[17] requires substantially similar proof, and "[t]o show a violation of section 17(a)(1), the SEC must prove (1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with scienter." *Id.* (citing *Aaron*, 446 U.S. at 697). To show a violation of section 17(a)(2) or 17(a)(3), the SEC need only demonstrate (1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with negligence. *Id.* (citing *Aaron*, 446 U.S. at 702).

With the exception of the scienter element, little discussion is warranted regarding the elements of the antifraud violations because there is simply no doubt as to whether GlobeTel issued misrepresentations or false statements concerning its revenue figures and whether those statements were issued in connection with

---

[17] 15 U.S.C. § 77q(a).

13

the offer, purchase, or sale of securities.  As appellants admit, from October 2004 through June 2006, GlobeTel's financial statements misstated the company's revenue by more than $100 million, and GlobeTel incorporated those misstatements into numerous periodic reports, securities registration statements, and press releases.

Monterosso and Vargas argue they did not "make" those false statements and contend under *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011), they cannot be liable.  *Janus* addressed the scope of Rule 10b–5(b) and the language providing it is unlawful to "'make any untrue statement of a material fact' in connection with the purchase or sale of securities." *Janus*, 131 S. Ct. at 2301 (quoting 17 C.F.R. § 240.10b–5).  The Court concluded that "[f]or purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 2302.  The Court consequently held a mutual-fund-investment advisor who had been involved in preparing prospectuses for a client did not "make" the statement contained therein for purposes of Rule 10b–5(b). *Id.* at 2305.

While *Janus* addressed misstatement claims under Rule 10b–5(b), Monterosso and Vargas are liable under section 17(a), section 10(b), and Rule

14

10b–5, because they made "deceptive contributions to an overall fraudulent scheme." R5–475 at 44. *Janus* only discussed what it means to "make" a statement for purposes of Rule 10b–5(b), and did not concern section 17(a)(1) or (3) or Rule 10b–5(a) or (c). *See Janus*, 131 S. Ct. at 2299–302. The operative language of section 17(a) does not require a defendant to "make" a statement in order to be liable. *See* 15 U.S.C. § 77q. Likewise, subsections (a) and (c) of Rule 10b–5 "are not so restricted" as subsection (b), because they are not limited to "the making of an untrue statement of a material fact." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 152–53 (1972). The case against Monterosso and Vargas did not rely on their "making" false statements, but instead concerned their commission of deceptive acts as part of a scheme to generate fictitious revenue for GlobeTel. Therefore, *Janus* has no bearing on this case.[18]

Monterosso and Vargas's primary contention on appeal is that summary judgment was precluded under section 10(b) and section 17(a)(1), because they did not intend to deceive, manipulate, or defraud.

> Scienter may be established by a showing of knowing misconduct or severe recklessness. . . . . Proof of recklessness [ ]

---

[18] In their motions opposing summary judgment, Monterosso and Vargas failed to raise the argument that the district judge should have distinguished between Rule 10b–5(a) and (c) and Rule 10b–5(b) violations, and we will not consider an argument on appeal not raised with the district judge. *See, e.g.*, *Fed. Deposit Ins. Corp. v. 232, Inc.*, 920 F.2d 815, 817 (11th Cir. 1991) (per curiam) ("[A]n appellate court generally will refuse to consider an issue not presented to the trial court and raised for the first time on appeal.").

require[s] a showing that the defendant's conduct was an extreme departure of the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982) (citation and alterations omitted).  While scienter is an issue ordinarily left to a trier of fact, there are cases in which summary judgment may be appropriate.  *See, e.g.*, *SEC v. Ficken*, 546 F.3d 45, 51–52 (1st Cir. 2008); *SEC v. Lyttle*, 538 F.3d 601, 603-04 (7th Cir. 2008) (finding summary judgment was appropriate because without testimony to contradict the SEC's circumstantial evidence of the defendants' beliefs and state of mind, "no reasonable jury could doubt that they had acted with scienter"); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989).  Scienter can be established through circumstantial or direct evidence.  *SEC v. Ginsburg*, 362 F.3d 1292, 1298 (11th Cir. 2004).

Monterosso and Vargas attempt to claim ignorance and argue they were under the impression that GlobeTel management had approved the "off-net" program.  Despite this alleged declaration of management assurance, however, Monterosso and Vargas cannot point to a genuine issue of material fact to demonstrate that a reasonable jury could doubt they acted with scienter.  Monterosso and Vargas cannot plausibly argue they believed GlobeTel could report revenue from switches neither owned nor leased by GlobeTel or its

16

subsidiaries.  As the district judge explained, "the concept is akin to Verizon recording revenue from telecom traffic run by AT&T."  R5–475 at 38.  And after submitting fictitiously manufactured invoices and unrelated CDRs to GlobeTel's accounting department, Monterosso and Vargas cannot plead ignorance of the fact that such reported revenue was illegitimate.  *See Lyttle*, 538 F.3d at 603–04.  Their defense that GlobeTel's executives were fully aware of the program and the nature of the invoices does not negate scienter, because "[o]ne doesn't have to be the inventor of a lie to be responsible for knowingly repeating it."  *See id.* at 604.

In order to corroborate Volta's fraudulent "off-net" invoices, Vargas would obtain and submit CDRs from Leblo, who had no connection to the companies that allegedly transacted business with Volta.  Monterosso knew the fraudulent "off-net" invoices would be entered in the company's ledger, and Vargas knew the Volta-to-Mercury invoice would be recognized as Volta revenue.  Monterosso and Vargas changed the names of customers and vendors and altered the amounts on invoices, and no reasonable person could have believed it was proper to report revenue from fabricated invoices.  They also submitted invoices and CDRs suggesting transactions between GlobeTel's subsidiaries and Hay's and Leblo's companies, yet never sent Hay or Leblo invoices showing the transactions.  Nor did they pay any purported vendors for the "off-net" traffic.

17

Moreover, Monterosso and Vargas were asked to reverse-engineer an ever-increasing amount of revenue. Most notably, in April 2005, Monterosso and Vargas were involved in producing an "additional" $1.6 million in revenue for the previous quarter. Lynch spoke with Monterosso and requested the additional revenue, and Monterosso then contacted Leblo to find out if he could provide the revenue. Vargas sent Leblo an email (with a copy to Monterosso) that attached a spreadsheet delineating the sources and amounts of the additional $1.6 million requested and allocating the amounts among GlobeTel's subsidiaries. According to the invoices submitted by Monterosso and Vargas, Volta only did business with Hay's companies. Consequently, by asking Leblo, someone who had no connection to Hay or his companies, to provide additional revenue for Volta, Monterosso and Vargas clearly knew the CDRs and invoices did not correspond to actual telecom traffic.

The evidence of Monterosso and Vargas's actions in GlobeTel's fraudulent scheme is overwhelming.[19] No reasonable jury could conclude Monterosso and Vargas were not conscious of the obvious risk that the fabricated invoices they were submitting misrepresented revenue and that by submitting those invoices and

---

[19] As to Vargas, we note the evidence of scienter is reinforced by the adverse inference from his invocation of the Fifth Amendment privilege at his deposition. *See Lyttle*, 538 F.3d at 604; *United States v. Two Parcels of Real Prop. Located in Russell Cnty., Ala.*, 92 F.3d 1123, 1129 (11th Cir. 1996) (per curiam) (recognizing, in civil actions, an adverse inference can be drawn when a party refuses to testify on Fifth Amendment grounds).

18

CDRs the accountants would rely on them to make entries in GlobeTel's general ledger. Monterosso and Vargas's actions in reverse-engineering revenue demonstrated, at the very least, proof of severe recklessness. Therefore, we agree with the district judge's conclusions and find no genuine issue of material fact as to scienter.[20]

B. Recordkeeping and Reporting Violations

Monterosso and Vargas also raise challenges to the district judge's granting summary judgment for the recordkeeping and reporting violations. First, Monterosso and Vargas contend they were not liable for violating Rule 13b2–1,[21] because they were not responsible for making entries in GlobeTel's books and records. Rule 13b2–1 prohibits directly or indirectly falsifying or causing to be falsified any book, record, or account subject to section 13(b)(2)(A) of the Exchange Act. Section 13(b)(2)(A) requires companies to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." 15 U.S.C. §

---

[20] Monterosso and Vargas also challenge the district judge's alternative finding that they would be liable under an aiding and abetting theory. Their arguments, however, again focus on their alleged lack of knowledge and awareness. As discussed above, the evidence was simply beyond question that they knowingly and actively participated in the scheme by fabricating invoices and submitting them to GlobeTel; therefore, their arguments as to aiding and abetting also fail. *See SEC v. Goble*, 682 F.3d 934, 947 (11th Cir. 2012) (recognizing to establish aiding and abetting liability under the securities laws, the SEC must show (1) a primary violation; (2) the aider and abettor had knowledge of the primary violation; and (3) the aider and abettor provided substantial assistance in the commission of the primary violation).

[21] 17 C.F.R. § 240.13b2–1.

78m(b)(2)(A).  While Monterosso and Vargas were not the ones who made the entries in GlobeTel's books and records, there was no genuine issue of material fact that they created the fake invoices and CDRs and transmitted those documents to GlobeTel.  As a result of Monterosso and Vargas's actions, GlobeTel's books, records, and accounts were falsified and the district judge did not err in holding them liable for violating Rule 13b2–1.

Vargas also argues Rule 13b2–2 does not apply to him because he was not an officer or a director of GlobeTel until late 2006.  Rule 13b2-2, however, prohibits a director or officer, "or any other person acting under the direction thereof," from misleading an accountant engaged in the audit or review of documents or reports required to be filed with the SEC.  17 C.F.R. § 240.13b2–2(b)(1).  An "officer" includes a "president [or] . . . any person routinely performing corresponding functions."  17 C.F.R. § 240.3b–2.  Because Monterosso was Centerline's president and Vargas was "acting under the direction" of Monterosso when he created and submitted the fraudulent GlobeTel invoices and CDRs, we find his argument to be unavailing.

20

C. <u>Remedies</u>

Monterosso and Vargas challenge different aspects of the district judge's disgorgement order, and all three appellants attack the district judge's imposition of civil penalties on several grounds.

1. Disgorgement

Disgorgement is an equitable remedy intended to prevent unjust enrichment. *SEC v. Yun*, 327 F.3d 1263, 1269 n.10 (11th Cir. 2003); *CFTC v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir. 1999).  In order to be entitled to disgorgement, the SEC needs to produce only a reasonable approximation of the defendant's ill-gotten gains, and "[e]xactitude is not a requirement."  *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005) (per curiam) (citation and internal quotation marks omitted).  Once the SEC has produced a reasonable approximation of the defendant's unlawfully acquired assets, the burden shifts to the defendant to demonstrate the SEC's estimate is not reasonable.  *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004) (per curiam).  We review a district judge's findings regarding the amount of ill-gotten gains to be disgorged for abuse of discretion. *See id.* at 1217–18.

First, Monterosso contends the district judge erred by imposing the disgorgement of funds not received in connection with any wrongdoing.  We find

21

this claim unpersuasive.  While Monterosso maintains he profited by only $116,000 from the fraudulent scheme, he ignores the proceeds he received in the form of debt-forgiveness and other cash he received.  Based on Monterosso's admissions in his deposition and pleadings, the district judge found: (1) Monterosso had received between $250,000 and $275,000 in cash compensation from GlobeTel for his work under the joint venture agreement; (2) Monterosso had received $325,000 in debt forgiveness from GlobeTel; and (3) Monterosso had been allowed to keep $100,000 in payments owed to GlobeTel by third parties.  Because the district judge's findings are supported by the record, we find no abuse of discretion.

Vargas also argues the district judge erred in holding Monterosso and Vargas jointly and severally liable for the disgorgement amount.  "It is a well settled principle that joint and several liability is appropriate in securities laws cases where two or more individuals or entities have close relationships in engaging in illegal conduct."  *Calvo*, 378 F.3d at 1215.  The district judge found that "Monterosso and Vargas clearly acted in concert to violate the securities law."  R6–554 at 9.  Vargas argues it would be inequitable to hold him liable for disgorgement when he did not receive proceeds.  The Ninth Circuit, however, has stated, and we agree, "a personal financial benefit" is not "a prerequisite for joint

22

and several liability." *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1098 (9th Cir. 2010).  Vargas was the sole owner of CSI, and CSI was to receive 5 million shares from GlobeTel if $25 million in revenue was generated.  GlobeTel paid CSI at least $130,000 for the revenue generated pursuant to the joint agreement, and Monterosso admitted CSI paid him and Vargas.  Given the close relationship between Monterosso and Vargas, and their collaboration in the fraudulent scheme, we find it was appropriate to hold them jointly and severally liable.  *See Calvo*, 378 F.3d at 1215–16.

### 2. Civil Penalties

The final arguments raised by the appellants involve the district judge's imposition of civil penalties.  Section 20(d) of the Securities Act[22] and section 21(d)(3) of the Exchange Act[23] authorize three tiers of monetary penalties for statutory violations.  The first-tier penalty may be imposed for any violation; a second-tier penalty may be imposed if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; and a third-tier penalty may be imposed when the second-tier requirements are met and the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," 15 U.S.C. §§ 77t(d)(2),

---

[22] 15 U.S.C. § 77t(d).
[23] 15 U.S.C. § 78u(d)(3).

78u(d)(3)(B).  Civil penalties are intended to punish the individual wrongdoer and to deter him and others from future securities violations.  *SEC v. Sargent*, 329 F.3d 34, 41 n.2 (1st Cir. 2003).  The statutes leave the amount to be imposed to the discretion of the district judge.  *SEC v. Warren*, 534 F.3d 1368, 1369 (11th Cir. 2008) (per curiam).

Monterosso argues the district judge's order imposing third-tier penalties was inappropriate because there was "no substantial loss to investors," and there was no evidence he made the misstatements.  While there was no direct evidence of loss, as the magistrate judge found, and the district judge agreed, the fraudulent scheme created a substantial risk of loss as the revenue overstatements would have been important to any reasonable shareholder.

Monterosso and Vargas argue the amount imposed as a civil penalty exceeded their ability to pay.  "At most, ability to pay is one factor to be considered in imposing a penalty."  *Warren*, 534 F.3d at 1370.  First, Monterosso's argument that the district judge should have considered his financial condition is waived, because he failed to raise this issue below.  *See Ramirez v. Sec'y, U.S. Dep't of Transp.*, 686 F.3d 1239, 1249 (11th Cir. 2012).  Regarding Vargas, the district judge did consider his financial condition and reduced the SEC's requested penalty because of Vargas's inability to pay; we therefore find that she did not

24

abuse her discretion in imposing the $150,000 penalty. *See Warren*, 534 F.3d at 1370 ("[N]othing in the securities laws expressly prohibits a court from imposing penalties or disgorgement liability in excess of a violator's ability to pay.").

Lynch argues the district judge erred in imposing a $780,000 penalty, which was higher in comparison to the penalties imposed upon co-defendants. Lynch settled as to liability and "for purposes of [a disgorgement and/or civil penalties] motion" accepted the allegations of the SEC's complaint as true.[24] R6–523–1 at 3 (Ex. A). Lynch therefore stipulated he had made or caused to be made fictitious entries for each quarter, he was a participant in the fraudulent scheme, and he had acted with scienter in making the fraudulent entries. Therefore, we find no merit to his argument the district judge erred in ignoring evidence of "his minimal involvement in the fraud." Lynch Br. at 13, 39–49.

Lynch also argues the district judge failed to weigh all the evidence before imposing the civil fine. It appears from the record, however, the judge did examine the evidence thoroughly, and used her discretion in determining the magistrate judge's recommended penalty was appropriate. Finally, Lynch argues the district judge imposed a disproportionate penalty compared to the other

---

[24] While Lynch makes an argument that the district judge abused her discretion in finding an adverse inference could be drawn from his invocation of his Fifth Amendment rights, any such inference is immaterial because the judge did not draw upon those inferences in assessing the civil penalties against Lynch.

defendants in the case. This argument is unavailing, because Lynch chose not to settle with the SEC as to penalties and he had a different role in the scheme than his co-defendants. Lynch was responsible for making fraudulent entries in GlobeTel's general ledger and knowingly signed several of the filings that reported the fictitious revenue. It was within the district judge's discretion to evaluate his involvement and to conclude, based on his activities in the fraudulent scheme, that the recommended penalty was appropriate. *See VanCook v. SEC*, 653 F.3d 130, 143–44 (2d Cir. 2011).

## III. CONCLUSION

Concluding the district judge did not err in granting summary judgment in favor of the SEC or in ruling on disgorgement and civil penalties, we affirm.

**AFFIRMED.**

26