HONORABLE STEVE C. JONES, UNITED STATES DISTRICT JUDGE
*1249 This matter appears before the Court on Plaintiff's Motion for Partial Summary Judgment against Defendants Donald V. Watkins, Sr. and Masada Resource Group ("Masada"). Doc. No. [108]. The Motion concerns the limited issue of whether these Defendants committed securities fraud with respect to three particular promissory notes. Id. As an initial matter, Defendants have filed a Motion for Leave to File a Sur-Reply in response to Plaintiff's motion. Doc. No. [117]. Neither the Federal Rules of Civil Procedure nor the Local Rules authorize the filing of sur-replies. Willoughby v. Youth Villages, Inc., 219 F.Supp.3d 1263, 1273 n.23 (N.D. Ga. 2016). The Court can, in its discretion, allow a sur-reply, but will do so only when a valid reason for additional briefing exists, such as when a movant raises new arguments in its reply brief. Id.; See also Fedrick v. Mercedes-Benz USA, LLC, 366 F.Supp.2d 1190, 1197 (N.D. Ga. 2005). Here, Defendants' reason for their proposed sur-reply is unpersuasive. Defendants do not contend that Plaintiff raised a new argument, that they have newly discovered evidence, or that there has been an intervening change in binding precedent. Instead, they simply rehash their prior arguments and respond to Plaintiff's contentions. Doc. No. [117].
When a reply "squarely responds to the arguments in [a] response brief, and does not advance new arguments," a sur-reply is unwarranted. Henley v. Turner Broad. Sys., Inc., 267 F.Supp.3d 1341, 1349 (N.D. Ga. 2017). To allow sur-replies as a matter of routine "would put the court in the position of refereeing an endless volley of briefs." Fedrick, 366 F.Supp.2d at 1197 (quoting Garrison v. Northeast Georgia Med. Ctr., Inc., 66 F.Supp.2d 1336, 1340 (N.D.Ga.1999) ). Defendants' Motion for Leave to File a Sur-Reply (Doc. No. [117] ) is DENIED .
Additionally, Defendants also attempted-again-to exceed the page limit in a brief by "incorporat[ing] all of the facts stated in the Watkins Declaration and their Statement of Additional Facts." Doc. No. [115], p. 5. The Court fails to understand how Defendants thought they would "save the Court's time and resources" by forcing the Court to troll a 20-page statement of facts, 25-page declaration, and more than 400 pages of attachments to divine what facts Defendants intend to rely on. See Docs. No. [114], [115-2]. This is not the first time the Court has had to explain page limits to Defendants. The Court previously denied a motion they filed because they tried to " 'incorporate[ ]' a variety of other documents resulting in a brief that is, in actuality, more than 100 pages long." Doc. No. [17], pp. 2-3. As the Eleventh Circuit has explained, "district court judges are not required to ferret out delectable facts buried in a massive record." Chavez v. Secretary, Florida Department of Corrections, 647 F.3d 1057, 1061 (11th Cir. 2011). In deciding the Motion for Partial Summary Judgment, the Court considers only facts-supported by citations to the record-that are actually discussed by, cited to, and relied on by the parties in their briefs.
I. BACKGROUND
Since 2009, Defendant Donald V. Watkins, Sr. has owned Defendant Watkins Pencor LLC ("WP") and controlled Defendant Masada Resource Group ("Masada"), entities that directly or indirectly own patents *1250 to technology that converts waste into ethanol. Doc. No. [108-2], p. 2, ¶ 1; Doc. No. [115-1], p. 1, ¶ 1. Watkins has also been involved with a variety of other businesses. He is a major shareholder of Alamerica Bank and, in May 2006 and September 2007, he took out loans of "approximately $2 million and $1.6 million, respectively, to purchase Alamerica Bank stock." Doc. No. [108-2], p. 3, ¶¶ 3, 5. He was the majority owner of Watkins Aviation, LLC, which was involved with an airplane-cargo venture named "Tradewinds" that led to lawsuits by two Detroit pension funds ("the Tradewinds Litigation"). Id. p. 4, ¶ 6; see also Doc. No. [115-1], p. 2, ¶ 6. Watkins and Watkins Aviation, LLC, were represented in the Tradewinds Litigation "by, among others, the Varnum law firm[;] the Brooks, Wilkins law firm; and Rich Hewlett." Doc. No. [108-2], p. 4, ¶ 7. Defendant Watkins also owns Nabirm, a company with rights to explore and exploit certain natural resources in Namibia. Id. ¶ 8.
During 2010 and 2011, Defendant Watkins was dating Marion Snell, who resided in Atlanta. Id. p. 5, ¶ 10. Watkins also owed his ex-wife-Deandra Watkins-$10,000 per month in alimony. Id. ¶ 11. His son, Donald V. Watkins, Jr., assisted with the administration of the businesses and handled the disbursement of funds, all of which were authorized and directed by Defendant Watkins. Id. ¶¶ 12-13. During the relevant time period, Defendant Watkins exclusively used the bank account of Relief Defendant Donald V. Watkins, PC ("DVWPC") for anything related to Masada. Id. ¶ 9.
Charles Barkley is a former NBA player and sole owner of Charles Barkley Enterprises. Id. ¶ 14. Between 2007 and 2012, Mr. Barkley personally or through his business invested or loaned at least $4,000,000 with Defendant Watkins. Doc. No. [107], p. 1, ¶ 3. In January 2007, Barkley purchased 5% of Defendant Watkins' economic interests in over a half-dozen different entities, including Masada. Doc. No. [114-1]. The purchase agreement mentions various operating agreements, but only in the context of: (1) "assignment provisions," (2) the "risk factors involved in [the] investment," and (3) the "buy-sell provisions." Id. pp. 2-3.[1] Thereafter, Defendant Watkins solicited money from Mr. Barkley on the other occasions that form the basis of Plaintiff's Motion for Partial Summary Judgment.
A. The First Barkley Note
On May 8, 2010, Defendant Watkins sent an email to Mr. Barkley stating that he had "an immediate opportunity ... to secure long-term waste management contracts for a Masada waste-to-ethanol in Morocco." Doc. No. [107-1], p. 2. He also said Masada had an opportunity to partner with "Mexico's richest man" for a project in that country, as well as opportunities for projects in "Senegal, South Africa, and South Korea." Id. Defendant Watkins claimed that he wanted to capitalize these projects through existing "Masada stakeholders" because "new equity partners coming in at this late date would get all of the upside in these transactions with very little downside." Id. In a follow up email on May 10, 2010, Defendant Watkins stated that he would "split the first $1 million for Morocco and Mexico until the other funds come in," but stated that he would "adjust the allocations as the funds come in and as needed." Doc. No. [107-2], p. 2.
*1251 Mr. Barkley agreed to provide $1,000,000 as requested and executed a promissory note dated May 14, 2010, which Defendant Watkins signed on behalf of DVWPC for Masada. Doc. No. [108-2], p. 7, ¶¶ 23-24. The note specifically stated that it "was made and transacted solely for business purposes related to Masada." Doc. No. [104-17], p. 2. It does not mention or incorporate the prior purchase agreement or the Masada Operating Agreement. See id. pp. 1-3. The day the note was signed, Mr. Barkley wired $1,000,000 to DVWPC, which was the first money Defendants received as a result of the emails sent to investors. Doc. No. [108-2], p. 8, ¶¶ 26-27.
The day before Mr. Barkley wired the money to DVWPC, its bank account contained less than $5,000. Id. ¶ 28;[2] see also Doc. No. [104-18], p. 2. Once he received Mr. Barkley's money, Defendant Watkins refunded just over $750,000 to a prior investor. See Doc. No. [104-18], p. 4; Doc. No. [104], pp. 154-55. He wrote a check for $10,015 to pay for housing and utilities for his then-girlfriend. See Doc. No. [104-18], p. 4; Doc. No. [104], pp. 132-33. Another $10,000 covered Defendant Watkins' monthly alimony payment to his ex-wife. See Doc. No. [104-18], p. 4; see also Doc. No. [104-25], pp. 3-4. And over $40,000 was used to pay the mortgage on Defendant Watkins' personal plane. See Doc. No. [104-18]; Doc. No. [104], pp. 113-14.
B. The Second Barkley Note
In May 2011, Defendant Watkins and Mr. Barkley renewed the 2010 loan, and Defendant Watkins sent Mr. Barkley an email asking for a "special purpose loan" of another $1,000,000. Doc. No. [107-3]. He represented that the money would be used "on [New York], San Francisco, and Atlanta investment bankers and lawyers" in anticipation of an acquisition of Masada by Waste Management (the "WM transaction"). Id. Mr. Barkley agreed to loan the funds and again executed a promissory note, which said the money would be used for business purposes and was signed by Defendant Watkins on behalf of DVWPC for Masada. Doc. No. [108-2], pp. 10-11, ¶¶ 35-37. The day before Mr. Barkley wired the second $1,000,000 to DVWPC, the company's bank account had a negative balance of $786.67. Id. p. 11, ¶ 38.
When Defendant Watkins received the funds, he gave a $7,000 "gift" to his son (Doc. No. [104-21], p. 6), sent over $40,000 to his then-girlfriend for the "House Account" (id. p. 27), and paid "partial alimony" to his ex-wife in the amount of $50,000 (id. p. 7). Defendant Watkins also used Mr. Barkley's loan to pay Defendant Watkins' personal debts, including a tax liability of more than $250,000 and more than $20,000 to repay the loans for Alamerica bank stock. Id. pp. 28-29; Doc. No. [105-15], p. 4. The lawyers that Defendant Watkins paid with Mr. Barkley's money were those who represented Watkins in the Tradewinds Litigation, not lawyers working on the supposed WM transaction. Doc. No. [104-21], p. 6; Doc. No. [105], pp. 105-06.
C. The Third Barkley Note
The final email at issue was sent on May 24, 2013, asking Mr. Barkley to lend Defendant *1252 Watkins "$150,000 to cover [his] financial exposure [until] June 1." Doc. No. [107-4], p. 3. Defendant Watkins represented that this temporary loan was needed because, during the prior week, Defendant Watkins "had to cover $600,000 in April and May expenditures" related to Masada and Nabirm projects "in Namibia, South Africa, [the United Kingdom], South Korea and Turkey." Id. p. 2. This supposedly included "substantial legal fees for Nabirm relating to [a] $10 million investment transaction currently being handled by Daniel Stewart & Company in London." Id.
In fact, Defendant Watkins' total expenditures in the month of May prior to the email to Mr. Barkley combined with all of his expenditures from the month of April amounted to less than $300,000. Doc. No. [108-2], pp. 14-15, ¶¶ 52-54; see also Docs. No. [105-28], [105-29]. The bank records contain no payments for "substantial legal fees" to Daniel Stewart & Company for the Nabirm investment. See Docs. No. [105-28], [105-29]. As evidenced by an email from Defendant Watkins to his son days before Mr. Barkley's money was solicited, the funds were mostly intended to cover credit card bills. Doc. No. [105-32]. Defendant Watkins was, in fact, in a "financial hole" of about $200,000 due to a mortgage arrearage and other bills. Id.
Mr. Barkley agreed to loan the $150,000, and Defendant Watkins signed a promissory note "for Masada." Doc. No. [104-23]. However, in an email sent over eight months later, Defendant Watkins characterized that loan as being for Nabirm. See Doc. No. [114-9], p. 2.[3]
II. LEGAL STANDARD
A. Summary Judgment
"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movement is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed. 2d 202 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).
The moving party bears the initial burden of showing, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed. 2d 265 (1986) ). The moving party's burden is discharged merely by " 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex, 477 U.S. at 325, 106 S.Ct. 2548. In determining whether the moving party has met this burden, this Court must consider the facts in the light most favorable to the nonmoving party. See Robinson v. Arrugueta, 415 F.3d 1252, 1257 (11th Cir.2005).
Once the moving party has adequately supported its motion, the non movant *1253 then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed. 2d 538 (1986). There is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. Id.; see also Nebula Glass Int'l, Inc. v. Reichhold, Inc., 454 F.3d 1203, 1210 (11th Cir. 2006) (the nonmoving party cannot survive summary judgment by pointing to "a mere scintilla of evidence"). If the nonmovant only presents evidence that is " 'merely colorable' or 'not significantly probative,' " summary judgment is still appropriate. Stephens v. Mid-Continent Cas. Co., 749 F.3d 1318, 1321 (11th Cir. 2014). All reasonable doubts, however, are resolved in the favor of the nonmoving party. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).
B. Securities Fraud
Section 10(b) of the Securities Exchange Act of 1934 ( "Exchange Act") and Section 17(a) of the Securities Act of 1933 ("Securities Act") prohibit material misrepresentations or omissions in connection with the purchase or sale of securities. S.E.C. v. Merch. Capital, LLC, 483 F.3d 747, 766 (11th Cir. 2007). Both Section 10(b) and Section 17(a)(1) require that the misrepresentation or omission be made with scienter. Id. Section 17(a)(2) and (3), on the other hand, require only a showing of negligence. Id. Finally, a corporate officer or director may be responsible for a violation of the anti-fraud provisions if he or she is the "maker" of the statement at issue-i.e. "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 142, 131 S.Ct. 2296, 2302, 180 L.Ed. 2d 166 (2011).
III. ANALYSIS
Plaintiff persuasively argues that the Barkley Notes are "securities" within the meaning of Section 10(b) and Section 17(a), and Defendants nowhere dispute this point. See Doc. No. [108-1], pp. 14-16; Doc. No. [115]; see also Reves v. Ernst & Young, 494 U.S. 56, 60-70, 110 S.Ct. 945, 948-53, 108 L.Ed. 2d 47 (1990). Nor is there any dispute that the emails sent by Defendant Watkins to Barkley necessarily involved the use of the means and instrumentalities of interstate commerce. Doc. No. [108-1], pp. 16-17; see also Doc. No. [115]. Thus, the questions before the Court are (1) whether Defendant Watkins made material misrepresentations or omissions in the emails and, if so, (2) whether those misrepresentations or omissions were made with scienter or negligence. See Merch. Capital, LLC, 483 F.3d at 766.
A. Material Misrepresentations and/or Omissions
In their entire 24-page brief in response to the Motion for Partial Summary Judgment, Defendants mention the emails to Mr. Barkley only briefly and in passing. They assert that Mr. Barkley did not actually read the emails and did not rely on them in deciding whether to invest with or loan money to Defendant Watkins. See Doc. No. [115], pp. 1-2, 21. Plaintiff disputes these assertions (Doc. No. [116], p. 10), but this dispute is immaterial. As Defendants themselves recognize, Plaintiff does not need to prove reliance or causation. Doc. No. [115], pp. 9-10. It simply does not matter whether Mr. Barkley read or relied on the emails. The only other time Defendants so much as mention the emails is to flatly assert that the emails are "cherry-picked" and that Defendant *1254 Watkins communicated "the proper context" to Mr. Barkley. Doc. No. [115], p. 17; see also Doc. No. [114], p. 3, ¶¶ 9-10. Because Defendants never explain how the emails are "cherry-picked" or what "proper context" Defendant Watkins supposedly communicated, the only thing the Court has to go on in deciding whether the emails contain material misrepresentations is the language used in the emails themselves.
In the first email, Defendant Watkins represented that he had "an immediate opportunity ... to secure long-term waste management contracts" in Morocco, Mexico, Senegal, South Africa, and South Korea. Doc. No. [107-1], p. 2. He wanted to capitalize these projects through existing "Masada stakeholders" because "new equity partners coming in at this late date would get all of the upside in these transactions with very little downside." Id. In the follow up email, he stated that he would "split the first $1 million for Morocco and Mexico until the other funds come in," but might "adjust the allocations as the funds come in and as needed." Doc. No. [107-2], p. 2.
But Defendant Watkins indisputably did not use Mr. Barkley's money in the manner represented in the emails. He refunded about $750,000 to a prior investor (see Doc. No. [104-18], p. 4; Doc. No. [104], pp. 154-55) and paid over $10,000 for housing and utilities for his then-girlfriend (see Doc. No. [104-18], p. 4; Doc. No. [104], pp. 132-33). Another $10,000 went to Defendant Watkins' ex-wife as a monthly alimony payment (see Doc. No. [104-18], p. 4; see also Doc. No. [104-25], pp. 3-4), and over $40,000 went to pay the mortgage on his personal plane (see Doc. No. [104-18]; Doc. No. [104], pp. 113-14).
Defendant Watkins attempts to explain away each of these as being for "Masada purposes." See, e.g., Doc. No. [104], pp. 113-14; 132-33; 154-58. But his argument misses the point entirely. When he asked Mr. Barkley for the million dollars, he did not represent that the funds would be used for general "Masada purposes." He specifically represented that the money would be used for certain international waste management projects. Doc. No. [107-1], p. 2. The money unequivocally was not used for those purposes, making Defendant Watkins' representations false.
Next, the Court must determine if the misrepresentations were material. "The test for materiality in the securities fraud context is 'whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action.' " Merch. Capital, LLC, 483 F.3d at 766 (quoting SEC v. Carriba Air, 681 F.2d 1318, 1323 (11th Cir.1982) ). The materiality requirement is meant "to filter out essentially useless information that a reasonable investor would not consider significant, even as part of a larger 'mix' of factors to consider in making his investment decision." Basic Inc. v. Levinson, 485 U.S. 224, 234, 108 S.Ct. 978, 985, 99 L.Ed. 2d 194 (1988). Defendants never so much as mention the misrepresentations made by Defendant Watkins, much less dispute that those misrepresentations were material. See Doc. No. [115]. Quite clearly, a reasonable investor would find the statements made by Defendant Watkins material-it was not simply "essentially useless information."
A reasonable investor who was told his funds would be used for a waste-to-ethanol partnership with "Mexico's richest man" would want to know that the funds were in fact going to be used to, for example, satisfy a personal alimony obligation. Likewise, a reasonable investor would most assuredly want to know that the vast majority of his money would be used to refund a previous investor. If a potential *1255 investor knew that a prior investor was backing out of the enterprise, he might well have serious doubts about investing. By falsely claiming that Mr. Barkley's money would be used to partner with wealthy businessmen on international waste management contracts, Defendant Watkins made material misrepresentations.
Likewise, Defendant Watkins made material misrepresentations in the May 13, 2011, email. He specifically said the money would be used for a "special purpose"-namely, to pay New York, "San Francisco, and Atlanta investment bankers and lawyers" in anticipation of the WM transaction. Doc. No. [107-3]. Again, he indisputably did not use the funds for that purpose. Instead, he gave a $7,000 "gift" to his son (Doc. No. [104-21], p. 6), sent over $40,000 to his then-girlfriend for the "House Account" (id. p. 27), and paid "partial alimony" to his ex-wife in the amount of $50,000 (id. p. 7). He also used Mr. Barkley's money to pay his personal debts, including a tax liability of more than $250,000 and more than $20,000 to repay the loans for Alamerica bank stock. Id. pp. 28-29; Doc. No. [105-15], p. 4. The lawyers that Defendant Watkins paid with the Mr. Barkley's funds were those who represented Watkins in the Tradewinds Litigation, not lawyers working on the WM transaction. Doc. No. [104-21], p. 6; Doc. No. [105], pp. 105-06.
Again, these misrepresentations were indisputably material. Defendant Watkins represented that the funds would be used to secure a potentially lucrative acquisition transaction. A reasonable investor obviously would have wanted to know that Defendant Watkins would, instead, use hundreds of thousands of dollars to pay personal loan obligations, personal alimony obligations, and personal tax obligations.
The final email at issue sought "$150,000 to cover [Defendant Watkins'] financial exposure." Doc. No. [107-4], p. 3. Defendant Watkins represented that this temporary loan was needed because, during the prior week, Defendant Watkins "had to cover $600,000 in April and May expenditures" related to Masada and Nabirm projects "in Namibia, South Africa, [the United Kingdom], South Korea and Turkey."Id. p. 2. This supposedly included "substantial legal fees for Nabirm relating to [a] $10 million investment transaction currently being handled by Daniel Stewart & Company in London." Id.
In fact, Defendant Watkins' total expenditures in the month of May prior to the email to Mr. Barkley combined with all of his expenditures from the month of April amounted to less than $300,000. See Docs. No. [105-28], [105-29]. The bank records contain no payments for "substantial legal fees" to Daniel Stewart & Company for the Nabirm investment. See id. Nowhere in their brief in response to the Motion for Partial Summary Judgment do Defendants address the discrepancy between what Defendant Watkins said about his expenditures and his actual expenditures. See Doc. No. [115]. Moreover, the misrepresentation is material because a reasonable investor would want to know that Defendant Watkins' expenses were actually less than half of what he represented-and spread out over a far greater period of time-and that the expenses did not, in fact, relate to legal fees being paid to a London based firm. As evidenced by the email Defendant Watkins sent to his son, his financial woes actually related to credit-card bills, a mortgage arrearage, and other bills. Doc. No. [105-32]. A reasonable investor would want to know the true reasons Defendant Watkins was soliciting investments. At a minimum, Defendant *1256 Watkins had a duty not to misrepresent his expenditures.
Given that Defendant Watkins made material misrepresentations in connection with all three Barkley notes, the last question the Court must address is whether those misrepresentations were made with scienter or mere negligence. See Merch. Capital, LLC, 483 F.3d at 766.
B. Scienter or Negligence
"Scienter may be established by a showing of knowing misconduct or severe recklessness." S.E.C. v. Carriba Air, Inc., 681 F.2d 1318, 1324 (11th Cir. 1982). To show recklessness, a plaintiff must demonstrate "that the defendant's conduct was an extreme departure of the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." S.E.C. v. Monterosso, 756 F.3d 1326, 1335 (11th Cir. 2014) (quoting Carriba Air, Inc., 681 F.2d at 1324 ). "While scienter is an issue ordinarily left to a trier of fact, there are cases in which summary judgment may be appropriate." Monterosso, 756 F.3d at 1335.
In their brief in response to the Motion for Partial Summary Judgment, Defendants never so much as argue that Defendant Watkins had any reasonable, good-faith belief that the representations he made to Mr. Barkley were true. See Doc. No. [115]. Instead, they argue scienter is disputed because of Defendant Watkins' use of the funds "was expressly authorized in the Masada Operating Agreement governing the business conduct between Mr. Barkley and the Defendants." Doc. No. [115], p. 13. During his deposition, Defendant Watkins was asked if he was required "to be accurate about" how money would be used when he told potential investors how he was "going to use their money." Doc. No. [104], p. 157. He responded that he was only "required to have a business purpose" for using the money and that he "had leeway to use the money however [he] needed to to [sic ] grow the business." Id. p. 158.
Not so. Regardless of whether the funds were ultimately used for "business purposes"-and Defendants' arguments on this point are conclusory and dubious at best-Defendant Watkins is not allowed to "make any untrue statement of a material fact" in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5(b). A business person could not convince people to invest in a widget factory, have them sign a note saying the money will be used for "business purposes," and then use the money to open a restaurant. The businessman cannot use the money for whatever business he might want simply because the note says the money will be used for "business purposes." The investors might believe that widget factories are good investment opportunities and that restaurants are too risky. This does not mean that a businessman has to discuss "every change in the direction of the business" or every expenditure with his investors. See Doc. No. [104], p. 157. But he cannot specifically represent that particular funds will be used for a specific project and then immediately use those funds for other purposes. An investor is entitled to accurate information "to consider in making his investment decision." See Basic Inc., 485 U.S. at 234, 108 S.Ct. 978.
In this case, just because the notes say Mr. Barkley's money will be used for "business purposes" does not mean that Defendant Watkins could make material misrepresentations to convince Mr. Barkley to invest. Defendants simply ignore the question of whether Defendant Watkins' emails contain untrue statements of material fact. They provide no explanation for *1257 why Defendant Watkins used Mr. Barkley's money for purposes other than those represented to Mr. Barkley, or why Defendant Watkins falsely claimed he "cover[ed]" $600,000 in expenditures in one week. Although scienter is an issue ordinarily left to a trier of fact, Defendant Watkins' conduct was such "an extreme departure of the standards of ordinary care" that it is "obvious that [he] must have been aware" his statements presented "a danger of misleading buyers." Monterosso, 756 F.3d at 1335.
By grossly exaggerating the expenditures he "had to cover," Defendant Watkins must have been aware that his representation would mislead Mr. Barkley into believing the $150,000 loan was necessary to the various Masada and Nabirm projects. Likewise, Defendant Watkins' misrepresentations that the money would be used on international projects and legal fees for the WM transaction presented an obvious danger of misleading a reasonable investor-causing the person to invest when he otherwise would not have if he had known how the funds would actually be used. Moreover, Defendant Watkins' actual use of the funds supports a finding of scienter. He used over $200,000 to pay his personal tax liability and over $20,000 to pay his personal loans for Alamerica bank stock. Doc. No. [104-21], pp. 28-29; Doc. No. [105-15], p. 4. "Misappropriating investor funds for personal benefit in and of itself establishes the requisite state of mind for committing securities fraud." S.E.C. v. Eldridge, 2007 WL 7654404, at *9 (N.D. Ga. Mar. 20, 2007) ; see also S.E.C. v. Reynolds, 2010 WL 3943729, at *4 (N.D. Ga. Oct. 5, 2010) (concluding that the defendant's "use of investor funds for personal expenses demonstrates a high level of scienter").
Additionally, in his first email to Mr. Barkley, Defendant Watkins represented that he wanted an investment from Mr. Barkley because "new equity partners coming in at this late date would get all of the upside" in the specific international projects Defendant Watkins described "with very little downside." Doc. No. [107-1], p. 2. In fact, Defendant Watkins used the money for what might generously be described as general "business purposes." Defendant Watkins apparently felt the need to bolster his misrepresentation by explaining why he wanted an investment from Mr. Barkley as opposed to potential "new equity partners." This is further evidence that Defendant Watkins deliberately misled Mr. Barkley because he knew Mr. Barkley would not have invested if he knew the true use of the funds.
Scienter can be established through circumstantial evidence, such as that discussed above. Monterosso, 756 F.3d at 1335. But the Court need not rely on circumstantial evidence alone. The Court has quasi-direct evidence in the form of Defendant Watkins' own testimony: he suggested he "had leeway to use the money however [he] needed to to [sic ] grow the business," regardless of what he represented to Mr. Barkley in the emails. See Doc. No. [104], pp. 157-58. Such testimony clearly indicates Defendant Watkins' "belief [he was] not obligated to be truthful" in the emails. See S.E.C. v. Torchia, 183 F.Supp.3d 1291, 1320-21 (N.D. Ga. 2016). During the deposition, Defendant Watkins pointedly refused to acknowledge any obligation to be truthful when telling investors how their money would be used, so long as the money was used for what he considered a "business purpose." See Doc. No. [104], pp. 157-58. Such evidence standing alone may be "sufficient to support a finding of scienter." Torchia, 183 F.Supp.3d at 1320-21.
Defendant Watkins' testimony, when coupled with the other record evidence, *1258 leaves no doubt that he acted with scienter. No reasonable jury could conclude otherwise. His conduct was such "an extreme departure of the standards of ordinary care" that it is "obvious that [he] must have been aware" his statements presented "a danger of misleading buyers." Monterosso, 756 F.3d at 1335. Defendant Watkins must have known that his misrepresentations would influence Mr. Barkley's decision to invest, and clearly believed (and still believes) that he can make misrepresentations to investors so long as the money is eventually used for a "business purpose." As the Court has repeatedly stressed, investors are entitled to accurate information "to consider in making [their] investment decision." See Basic Inc., 485 U.S. at 234, 108 S.Ct. 978.
Defendant Watkins is adamant that he used the funds for proper business purposes, that Mr. Barkley would have agreed to invest the funds solely on the basis of their friendship, and that Mr. Barkley would have-and did-give Defendant Watkins free rein to decide how the funds should be used. But if Defendant Watkins wanted to raise funds for general "business purposes," then he was obliged to be truthful about his purpose. If he truly believed Mr. Barkley would have invested no matter what business purpose he used the money for, why did Defendant Watkins make such blatant misrepresentations when he solicited the investments?
By making those misrepresentations about how the money would be used, he denied Mr. Barkley the kind of accurate information needed to make his investment decisions. Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act are directed at preventing such material misrepresentations in connection with the sale of securities. See Merch. Capital, LLC, 483 F.3d at 766. As discussed above, no reasonable jury could conclude that the misrepresentations were made without scienter. Even if there were no scienter, there can be no doubt that Defendant Watkins' actions were, at a minimum, negligent, meaning Plaintiff has established violations of Sections 17(a)(2) and (3) of the Securities Act. See Torchia, 183 F.Supp.3d at 1311.
C. Liability and Remedies
Defendant Watkins was unquestionably the "maker" of the misrepresentations in each of the emails at issue because he was "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." See Janus, 564 U.S. at 142, 131 S.Ct. 2296. Thus, he is liable for each of the misstatement. With respect to the emails regarding the first two loans, Defendant Watkins' actions were indisputably on behalf of Masada, and thus his scienter may be imputed to the company. See SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1089 n.3, 1097 n.18 (2d Cir. 1972). However, with respect to the email soliciting the $150,000 loan, the Court cannot say, as a matter of law, that Masada is liable for the misrepresentations. To be sure the email mentions alleged expenses on Masada projects (Doc. No. [107-4], p. 2), and the promissory note itself says it's "for Masada" (Doc. No. [104-23] ). However, the email also mentions fees and expenses "for Nabirm" (Doc. No. [107-4], p. 2), and Defendant Watkins' email in February 2014 characterizes the loan as being for Nabirm (see Doc. No. [114-9], p. 2). Thus, it is not clear if Defendant Watkins acted in his capacity as a corporate representative of Masada when he made misrepresentations that led to the $150,000 loan.
Lastly, Plaintiff asks the Court to deem DVWPC "a constructive trustee" of the funds that Mr. Barkley loaned to Defendant Watkins. Doc. No. [108-1], pp. 24-25.
*1259 Defendants respond that disgorgement would be barred by the statute of limitations. Doc. No. [115], p. 14. As Plaintiff recognizes, "any decision with respect to specific remedies, such as disgorgement or civil penalties, is premature and beyond the scope of this summary judgment motion." Doc. No. [116], p. 13. But the Court cannot impose a constructive trust on the record currently before it.
Before the Court can impose "a constructive trust, there must be an identifiable res on which the trust can be impressed." In re Fin. Federated Title & Tr. Inc., 273 B.R. 706, 718 (Bankr. S.D. Fla. 2001), aff'd 347 F.3d 880 (11th Cir. 2003). "If the original res no longer remains, but is transformed into a different form, it is the burden of the party seeking to impress a constructive trust to trace the property to specific funds before it can prevail." Id. The Court cannot, at this time, impose a constructive trust because Plaintiff has not identified a particular res on which the trust can be impressed. To be sure, any ill-gotten funds were deposited into the bank account of DVWPC. See Doc. No. [108-2], p. 5, ¶ 9; see also Doc. No. [104-18], p. 1; Doc. No. [104-21], p. 2; Doc. No. [105-29], p. 2. But the $2,150,000 Mr. Barkley loaned to Defendant Watkins and his companies did not sit idly in DVWPC's bank account. It was used, interest on the loans grew, and the loans were renewed. The Court does not have an accounting of how much any of the Defendants was unjustly enriched, and thus there is presently no identifiable res on which to impose a constructive trust.
IV. CONCLUSION
For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment (Doc. No. [108] ) is GRANTED in part and DENIED in part . To the extent that Plaintiff asks the Court to determine liability under Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act as to Defendant Watkins with respect to all three promissory notes at issue and Defendant Masada as to the 2010 and 2011 promissory notes, the Motion is GRANTED . However, the Motion is DENIED to the extent Plaintiff asks the Court to decide, as a matter of law, that Masada is liable for the misrepresentations made in connection with the May 2013 promissory note and to the extent Plaintiff asks the Court impose a constructive trust against Relief Defendant DVWPC. As noted above, Defendants' Motion for Leave to File a Sur-Reply (Doc. No. [117] ) is DENIED .
IT IS SO ORDERED, this 27th day of June, 2018.

The document does not, as Defendants argue, state that Mr. Barkley "agreed to be bound by all of the terms and conditions of the Masada Operating Agreement." See Doc. No. [115], p. 7. Indeed, there is no indication Mr. Barkley ever saw the 1998 Masada Operating Agreement on which Defendants' entire argument hinges.

Defendants "object" to many of Plaintiff's statements of material fact by arguing the supporting documents are "the 'best evidence' " of the facts asserted and contending that each document "speaks for itself." See, e.g., Doc. No. [115-1], p. 6, ¶ 28. This is not a valid objection. Defendants do not actually dispute any of the facts being asserted, nor do they show "that the materials cited do not establish" the facts asserted. See Fed. R. Civ. P. 56(c)(1). Thus, the Court deems such facts undisputed for the purposes of the present motion. Id. 56(e)(2).

The email does not explicitly discuss the $150,000 loan, but rather asked Mr. Barkley for a $1,000,000 "capital infusion" into Masada. Doc. No. [114-9], p. 3. He also asked Mr. Barkley "to consider converting the $2 million in loans [he had] made to Masada into equity," which would have relieved Defendants of responsibility for paying back the loans. See id. In exchange, Defendant Watkins offered an increased equity share in Masada, which he estimated was worth "in excess of $1 billion." Id.